**Juan C. Chavez**, OSB #136428
Email: juan@chavezlawpdx.com
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270 ext. 212
Facsimile: 503-715-5763
**Crystal S. Maloney**, OSB #164327
Email: crystal.s.maloney@gmail.com
333 SW Taylor St., Ste. 300
Portland, OR 97204

     Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| RAFAEL MORA-CONTRERAS; and SHANE STAGGS,<br><br>Plaintiffs,<br><br>vs.<br><br>COLETTE PETERS; DOUG YANCEY; MEGHAN LEDDY; ZACHARY GOULD; CRAIG PRINS; JERRY PLANTE; JEREMY NOFZIGER; and JOHN DOES 1-5,<br><br>Defendants. | Case No. 6:18-cv-00678-SB<br><br>AMENDED COMPLAINT<br><br>Civil Rights Action (42 U.S.C. § 1983) for violations of 1st, 5th, 8th and 14th Amendments<br><br>DEMAND FOR JURY TRIAL |

This is a Civil Rights action stemming from Defendants' unconstitutional actions against Plaintiffs Rafael Mora-Contreras, an inmate at the Oregon State Correctional Institution, and Shane Staggs, an inmate in Snake River Correctional Institution. The Special Investigations Unit (SIU) for the Oregon Department of Correction (ODOC) have unconstitutionally used solitary confinement, fabrication of evidence, and other means to punish inmates without due process. Plaintiff Staggs faces a substantial likelihood of being placed in solitary confinement again, and

AMENDED COMPLAINT
Page 1

both Plaintiffs request declaratory and injunctive relief from such unconstitutional and barbaric treatment.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §§ 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Salem, Marion County, Oregon.

## PARTIES

3. At the time of this filing, Plaintiff Rafael Mora-Contreras currently resides at the Washington County Jail in Hillsboro, OR.

4. At the time of this filing, Plaintiff Shane Staggs currently resides at the Snake River Correctional Institute in Ontario, Oregon.

5. Defendant Doug Yancey is a correctional officer with the Oregon Department of Corrections, and one of the two head Security and Threat Management officers at the Oregon State Penitentiary. At all times relevant, Lt. Yancey was acting under color of law. He is sued in his individual and official capacity.

6. Defendant Zachary Gould is a correctional officer with the Oregon Department of Corrections. At all times relevant, Gould was acting under color of law. He is sued in his individual and official capacity.

7. Defendant Meghan Leddy is a correctional officer with the Oregon Department of Corrections. At all times relevant, Inspector Leddy was acting under color of law. She is sued in her individual and official capacity.

8. Defendant Jerry Plante is a correctional officer with the Oregon Department of Corrections. At all times relevant, Defendant Plante was acting under color of law. He is sued in his individual and official capacity.

9. Defendant Craig Prins is the head officer of the Special Investigations Unit for the Oregon Department of Corrections. At all times relevant, Defendant Prins was acting under color of law. He is sued in his individual and official capacity.

10. Defendant Jeffrey Nofziger is a hearings officer for the Oregon Department of Corrections. At all times relevant, Defendant Nofziger was acting under color of law. He is sued in his individual and official capacity.

11. Defendant Colette Peters is the Director and Deputy Director of the Oregon Department of Corrections, and is sued in her official capacity. At all times relevant, Ms. Peters was acting under color of law.  Defendant Peters is the ultimate authority for the policies of the Oregon Department of Corrections.

12. Plaintiffs do not know the true names and capacities of Defendants sued herein as John Does 1-5, and therefore sue these Defendants by fictitious names. John Does 1-5 are sued in their individual capacity, and are any State of Oregon, or other state actor personnel who exercised responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the tortious violations as hereinafter alleged.

## FACTUAL ALLEGATIONS

13.     Around April 2016, after some inmates died from an influx of drugs into ODOC, the Special Investigations Unit (SIU) and Security Threat Management (STM) began investigating inmates they arbitrarily presumed to be threats to the facility. Despite not having a history of misconduct, SIU and STM selectively targeted Plaintiffs for punishment as a show of force.

14.     In the summer of 2016, a riot allegedly erupted at Oregon State Penitentiary. As happens in prison altercations, un-involved inmates were forced to either defend themselves or flee. Some inmates were disciplined for even taking a single step toward the riot, despite not participating. Other inmates were implicated by inmates seeking leniency or favors from correctional officers.

15.     Upon information and belief, SIU/STM wanted to hold inmates "accountable" for the drug influx and riot, and attempted to levy cases against inmates whom the institution distrusted or whom challenged their notion of authority.

16.     Particularly, Defendant Yancey used a combination of punitive, retaliatory solitary confinement, bribes in the form of drink tickets, and intimidation to coerce confessions out of uncooperative inmates.

## Solitary Confinement in Oregon

17.     Solitary confinement takes several forms in Oregon. The most common is disciplinary segregation in the Disciplinary Segregation Unit (DSU), where people are sent via sanction for most basic rule violations.[1] Often, DSU is the first point of contact for solitary confinement in ODOC. Some inmates are transferred to Administrative Segregation Unit (ASU) or the Intensive

---

[1] Allison Hastings, Elena Vanko, and Jessi LaChance, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Oregon Department of Corrections*, Vera Institute (Oct. 2016), 18, https://storage.googleapis.com/vera-web-assets/downloads/Publications/safe-alternatives-segregation-initiative-findings-recommendations/legacy_downloads/safe-alternatives-segregation-initiative-findings-recommendations-odoc.pdf

Management Unit (IMU), or are placed in ASU/IMU prior to a hearing on their disciplinary sanction, as Plaintiffs were.[2]

18. Regardless of designation of type of segregation, solitary confinement in Oregon means spending on average 23 hours in a 6-by-10-foot cell with no natural light or access to outdoors or fresh air and limited opportunities to speak to people.[3] Per ODOC policy, the inmate should have "minimal" time outside their cell.[4] By Mr. Staggs's estimation, the DSU cells are smaller than other ODOC facilities, and around 8-by-5 foot in size.

19. The growing body of evidence being developed regarding solitary confinement demonstrates the harm it creates, including severe confusional, paranoid, and hallucinatory features, as well intense agitation and random, impulsive, often self-directed violence—even in persons with no prior mental illness.[5] Long term psychological effects include anxiety, symptoms of "post traumatic stress (such as flashbacks, chronic hypervigilance, and a pervasive sense of hopelessness)," and reduced sociability.[6]

20. The injuries caused by solitary confinement are physical, even without direct self-harm. Using electroencephalography (EEG), studies from as far back as the 1960s have shown that prolonged isolation creates brain damage comparable to traumatic head injuries.[7]

21. The United Nations Committee Against Torture found the United States' excessive use of solitary confinement was a violation of a U.N. convention against torture and inhumane punishment, of which the United States of America is a signatory and has ratified.[8]

---

[2] *Id.*
[3] *Id.* at 26.
[4] OAR 291-011-025
[5] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325, 328-9 (2006), https://openscholarship.wustl.edu/law_journal_law_policy/vol22/iss1/24/
[6] *Id.* at 353.
[7] Atul Gawande, Hellhole, *The New Yorker* (March 30, 2009 issue) https://www.newyorker.com/magazine/2009/03/30/hellhole
[8] U.N. Committee Against Torture, *Concluding observations on the third to fifth periodic reports*

22.    Typically, solitary confinement comes with additional punishments beyond the scope of restricted housing. These additional sanctions include demotion from contact visits to basic visits, loss of privileges, loss of employment, loss of programs, loss of access to rehabilitative classes, fines, and good time retractions.

23.    Despite the extreme nature of the sanction, in a study conducted by the Vera Institute they found that "people often cycle through disciplinary segregation for nonviolent rule violations; in fact, the top rule violation resulting in a disciplinary segregation sanction was disobedience of an order."[9]

24.    Vera also found that "black and Hispanic people are disproportionately housed in the more punitive forms of administrative segregation. By contrast, these same minority groups are under-represented in the more treatment-oriented and less restrictive special housing units, namely the Mental Health Infirmary (MHI) and Administrative Housing Unit (AHU)."[10]

25.    As with most statistics regarding mass incarceration, "people of color comprise 26 percent of the total prison population, but 34.3 percent of its segregated population."[11]

26.    Upon information and belief, while ODOC policies prevent unit managers from placing inmates in administrative housing for longer than 180 days,[12] ODOC officers get around this requirement by releasing inmates from ASU/IMU for a day or two before placing them back into solitary confinement.

**Allegations Specific to Mr. Mora-Contreras**

---

*of United States of America*, U.S. State Department, 9 (November 20, 2014) https://www.state.gov/documents/organization/234772.pdf
[9] Hastings, *supra* at 3.
[10] *Id.* at 57.
[11] *Id.* at 56-57.
[12] OAR 291-046-0030

27.     Mr. Mora-Contreras, a person of color, has attempted to build a life of service and meaning within ODOC. Mr. Mora-Contreras started a cultural heritage group within ODOC for Latino inmates, took classes, and had twelve years of good conduct.

28.     On April 22, 2016, Mr. Mora-Contreras was placed into administrative segregation at the Oregon State Penitentiary (OSP) for 68 days. The request for Administrative Segregation was signed by Defendant Zach Gould. SIU alleged that Mr. Mora-Contreras was under investigation for alleged drug possession and distribution charges. For the recommended placement length, the Functional Unit Manager wrote "90 days." Defendant Leddy had been "investigating" the allegations, and ultimately brought the case against Mr. Mora-Contreras. Defendant Craig Prins oversees the SIU, and supervises its operations.

29.     In addition to being placed in administrative segregation, DOC charged Mr. Mora-Contreras with several DOC rule violations, per Defendant Leddy's recommendation.

30.     At his required 30 day administrative segregation hearings, Mr. Mora-Contreras provided a compelling, factual argument as to why he should be released from solitary confinement. Defendant Nofziger cited the open SIU investigation as his sole justification for further administrative segregation, and did not take mitigating facts into account.

31.     He had been told by other DOC officials that he could be released if he corroborated incriminating allegations against other inmates, regardless if the statements were true or not.

32.     Mr. Mora-Contreras sought and retained legal counsel, a rarity at ODOC hearings. On June 23, 2016, at his DR Hearing, Mr. Mora-Contreras was acquitted of any DOC rule-breaking. Despite his acquittal, Defendant Yancey continued to assail Mr. Mora-Contreras, telling him, "I don't give a [expletitive] about lawyers, I know you're guilty. Give me info on what you got." Mr. Mora-Contreras declined.

33.     Through the summer, Defendant Yancey attempted to extort other inmates into giving false information about Mr. Mora-Contreras. Most distressingly is the case of Mr. Jaime Ramirez-Gonzalez, a man who Defendant Yancey threatened with retaliation. On April 22, 2016, the date SIU placed Mr. Mora-Contreras in DSU, Mr. Ramirez-Gonzalez was also placed in DSU.

34.     Defendant Yancey told him if he cooperated by providing incriminating evidence against Mr. Mora-Contreras, he would be placed back in general population with "privileges." Mr. Ramirez-Gonzalez remained in segregation until June 20, 2016, three days before Mr. Mora-Contreras's hearing. On June 20, he was again asked by Defendant Yancey to give incriminating information about Mr. Mora-Contreras. Mr. Ramirez-Gonzalez against refused.

35.     About a month later, on July 24, 2016, Mr. Ramirez-Gonzalez was assaulted by another inmate, severely injuring him. A little over a week later, on August 3, 2016, Defendant Yancey called Mr. Ramirez-Gonzalez into his office, demanding "intel" about Mr. Mora-Contreras. Mr. Ramirez-Gonzalez again refused. When Mr. Ramirez-Gonzalez asked Defendant Yancey to transfer out of OSP for his safety, Defendant Yancey told him that if he got assaulted, he "had it coming."

36.     The next day, on August 4, 2016, a white supremacist gang called "Brood" assaulted Mr. Ramirez-Gonzalez because Defendant Yancey had told them he was a snitch. The assault on Mr. Ramirez-Gonzalez caused a mass inmate brawl, involving nearly 200 inmates.

37.     That same day, after quelling the "riot," Defendant Yancey called in Mr. Ramirez-Gonzalez, calling him a "piece of shit," and demanded that he implicate Mr. Mora-Contreras in the riot. Mr. Ramirez-Gonzalez declined. Because he declined, Defendant Yancey drafted a memorandum that resulted in Mr. Ramirez-Gonzalez being placed in DSU for 10 months.

38. Upon information and belief, Defendant Yancey knowingly used false testimony from inmate informants whom he had either bribed with favors or material goods, like drink tickets or wrist watches, or coerced with threats. Some testimony, as Mr. Staggs alleges below, was completely fabricated.

39. Defendant Yancey called Mr. Mora-Contreras to his office, again asking for incriminating information about the recent riot. Mr. Mora-Contreras declined. For lack of no other options to further punish Mr. Mora-Contreras, Defendant Yancey had Mr. Mora-Contreras transferred to Two Rivers Correctional Institution (TRCI) in Umatilla, OR, more than 200 miles away.

40. Mr. Mora-Contreras asked guards at TRCI why he had been transferred. The guards told him that he "had caused a riot and brought drugs in to OSP." When Mr. Mora-Contreras told them that he had not, and that he had a clean record, he was told, "Well, I guess you must have just really pissed off Yancey."

41. Because of his solitary confinement, Mr. Mora-Contreras suffered emotionally, and physically. Like many who go into solitary confinement, Mr. Mora-Contreras felt severe distress, anxiety, sleeplessness, shortness of breath, and tension. Eventually, he had auditory hallucinations. He lost twenty pounds in the span of his solitary detention. Even after release from solitary confinement, Mr. Mora-Contreras feels anxiety from recalling the trauma of being placed in solitary confinement. He lives in fear of being placed back into solitary confinement.

42. He also lost several opportunities while in solitary confinement, such as work (making $70 a month as a photographer), classes, honor housing (which took four years to work for and receive), participation in the Latino Club, and access to Family First (a program wherein Mr. Mora-Contreras could meet with his family members and loved ones in a freer environment).

43.     After his DR acquittal, Mr. Mora-Contreras retained clean conduct while in ODOC custody.

///

///

## Allegations Specific to Shane Staggs

44.     Mr. Staggs, a person of color, was an inmate at OSP. On October 7, 2016, Mr. Staggs's cellmate was caught with drugs in his pocket. Defendant Yancey wanted to find Mr. Staggs guilty, so he began building a case against him. Defendant Yancey had Mr. Staggs placed in DSU immediately, where he remained for a week.

45.     Mr. Staggs worked at the laundry facility, earning $100 a month. He also attended Drug Awareness, and took classes. Because he went to DSU, Mr. Staggs lost all of these privileges, even after release.

46.     Mr. Staggs's fiancé had a speaking relationship with Defendant Yancey, who called her the day Mr. Staggs's cellmate was caught. Defendant Yancey began accusing Mr. Staggs of malfeasance, saying that he didn't have proof but he had a hunch that Mr. Staggs had given drugs to his cellmate and Mr. Staggs will be placed in DSU until he has proof. He informed Mr. Staggs's fiancé that he will receive a DR soon.

47.     Mr. Staggs was again sent to DSU on November 17, 2016. Like Mr. Mora-Contreras, the justification for his placement in DSU was a formulaic statement of "for the safety, security and orderly operation of the facility." The hearings officer approved Mr. Staggs to stay in DSU for 180 days (6 months). Defendant Plante conducted the investigation, and provided the "factual" basis to administratively prosecute Mr. Staggs, who did not receive a DR until January 2017.

48. Mr. Staggs sat in DSU from November to January 2017 without a pending DR because Defendant Plante was on vacation. Despite having not truly having a pending investigation, regardless Mr. Staggs sat in solitary confinement.

49. Mr. Staggs's DR alleged that another inmate claimed the two of them conspired to bring drugs into the facility. The inmate, Mr. X (this inmate prefers to keep his name anonymous in public filings), had never met Mr. Staggs, nor had any idea who each other were. Mr. X had similarly been targeted by Defendant Yancey, despite having no disciplinary history. Defendant Yancey had fabricated evidence and used a confidential informant to implicate Mr. X in a drug running conspiracy.

50. Defendant Yancey claimed that Mr. X had informed on Mr. Staggs, but that was a clear fabrication. Defendant Yancey claimed he had paid informants in ODOC as another means to intimidate Mr. Staggs. Upon information and belief, Defendant Yancey had bribed inmates, with favors, drink tickets, and wrist watches, to falsely inform on Mr. Staggs.

51. Because of his solitary confinement, Mr. Staggs suffered emotionally, and physically. Mr. Staggs suffered from anxiety, depression, and lack of sleep.

52. The conditions in solitary confinement were barbaric, shocking, and cruel. Mr. Staggs not only suffered the above-mentioned ill health effects, but he was directly and vicariously traumatized by the manner in which cell extractions were performed on inmates in solitary confinement. Because of the disorienting nature of solitary confinement, Mr. Staggs has difficultly knowing precisely when these extractions occurred; however, based upon information and his personal experience, cell extractions intentionally terrorized people in solitary confinement. When Correctional Officers performed cell extractions, they would taunt the inmates with insults and rock music over the intercom. The Officers would pepper spray or tase

inmates for merely disagreeing with them. Whenever another person was pepper sprayed in another cell, the spray would enter Mr. Staggs's cell through the air vents, irritating his senses. Mr. Staggs also lost privileges, such as family visits, and his job because of this. These particular conditions of confinement further caused Mr. Staggs injury he would not have had were his rights not violated.

**CLAIMS FOR RELIEF**

53.     Plaintiff brings claims under 42 USC § 1983, for violations made by Defendants Yancey, Leddy, Gould, Plante, Prins, Nofziger, Peters, and John Does 1-5 of Plaintiffs' Fifth Amendment rights under the due process clause; Plaintiffs' First Amendment rights to be free from compelled speech and retaliation; Plaintiffs' Eighth Amendment rights to be free from cruel or unusual punishments; and Plaintiffs' Fourteenth Amendment rights to be free from unequal treatment under the law.

54.     The Defendants are all persons within the meaning of 42 U.S.C. 1983.

55.     Plaintiff seeks an award of economic damages, non-economic damages, punitive damages where appropriate, attorney fees and litigation expenses/costs against defendants.

**CLAIM 1: VIOLATION OF FIFTH AMENDEMENT**
**(Procedural and Substantive Due Process – 42 U.S.C. 1983 – Individual Liability)**

56.     Plaintiffs restate and incorporate here the allegations in paragraphs 1 through 54.

57.     The Fifth Amendment applies to the States through the Fourteenth Amendment. Through its due process clause, the Fifth Amendment the rights to due process of law, both procedurally and substantively.

58.     In taking the actions described above, including but not limited to using solitary confinement, fabricating evidence, transferring inmates to far away facilities as retaliation, coercing false statements from informants, and giving and validating prolonged arbitrary solitary

Page 12

detention lengths without meaningful process, Defendants intentionally violated Plaintiffs' rights to be free unlawful deprivation of due process.

59.     Defendant's treatment of Plaintiffs were disproportionate to the offense, which is a violation of a substantive right secured to all Oregon prisoners under Or Const Art. 1 § 16, it created unnecessary rigor, a substantive right secured for all Oregon Prisoners under Or Const Art. 1 § 13, and this punishment was not tied to the "protection of society, personal responsibility, accountability for one's actions and reformation" of him, a substantive right secured for all Oregon Prisoners under Or Const Art. 1 § 15.58.     As supervisor of SIU, Defendant Prins inaction in the training, supervision, and control of his subordinates, Defendants Yancey, Gould, Plante, and Nofziger, acquiesced to the constitutional deprivations against the Plaintiffs.

60.     The actions of Defendant Yancey, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs. As a result of said intentional conduct, Plaintiffs are entitled to punitive damages against Defendant Yancey, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

61.     The unreasonable deprivation of Plaintiffs' rights was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, shock, anxiety, nervousness, and loss of ability to enjoy certain recreational and leisure activities.  Plaintiffs are entitled to all of his damages in an amount to be ascertained according to proof at trial.

62.     Additionally, see below, Plaintiffs seek declaratory relief that such conduct was unconstitutional, and that solitary confinement as used by the Oregon Department of Corrections violates both substantive and procedural due process.

## CLAIM 2: VIOLATION OF EIGHTH AMENDMENT
### (Cruel and Unusual Punishment – 42 USC § 1983 – Individual liability)

63.     Plaintiffs restate and incorporate here the allegations in paragraphs 1 through 61.

64.     The Eighth Amendment applies to the States through the Fourteenth Amendment. The Eighth Amendment prevents imposition of cruel and unusual punishments.

65.     In taking the actions described above, including but not limited to using solitary confinement, fabricating evidence, transferring inmates to far away facilities as retaliation, coercing false statements from informants, and giving and validating prolonged arbitrary solitary detention lengths without meaningful process, Defendants intentionally violated Plaintiffs' rights to be cruel and unusual punishment through use of their shocking and barbarous practices, disproportionately penalizing the prisoners given the alleged facts above.

66.     As supervisor of SIU, Defendant Prins inaction in the training, supervision, and control of his subordinates, Defendants Yancey, Gould, Plante, and Nofziger, acquiesced to the constitutional deprivations against the Plaintiffs.

67.     The unreasonable deprivation of Plaintiffs' rights was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, shock, anxiety, nervousness, and loss of ability to enjoy certain recreational and leisure activities.  Plaintiffs are entitled to all of his damages in an amount to be ascertained according to proof at trial.

68. Additionally, see below, Plaintiffs seek declaratory relief that such conduct was unconstitutional, and that solitary confinement as used by the Oregon Department of Corrections violates the Eighth Amendment bar on imposition of cruel and unusual punishment.

## CLAIM 3: VIOLATION OF FOURTEENTH AMENDMENT
(Equal protection under the law – 42 USC § 1983 – Individual liability)

69. Plaintiffs restate and incorporate here the allegations in paragraphs 1 through 67.

70. The Fourteenth Amendment protects inmates from invidious discrimination because of race, or other reasons.

71. In taking the actions described above, including but not limited to using solitary confinement (an institution which arbitrarily punishes people of color at greater rates), fabricating evidence, transferring inmates to far away facilities as retaliation, coercing false statements from informants, and giving and validating prolonged arbitrary solitary detention lengths without meaningful process, Defendants intentionally violated Plaintiffs' rights to be treated equally under the law.

72. As supervisor of SIU, Defendant Prins inaction in the training, supervision, and control of his subordinates, Defendants Yancey, Gould, Plante, and Nofziger, acquiesced to the constitutional deprivations against the Plaintiffs.

73. The unreasonable deprivation of Plaintiffs' rights was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, shock, anxiety, nervousness, and loss of ability to enjoy certain recreational and leisure activities.  Plaintiffs are entitled to all of his damages in an amount to be ascertained according to proof at trial.

74. Additionally, see below, Plaintiffs seek declaratory relief that such conduct was unconstitutional, and that solitary confinement as used by the Oregon Department of Corrections violates the Eighth Amendment bar on imposition of cruel and unusual punishment.

### CLAIM 4: VIOLATION OF FIRST AMENDEMENT
**(Compelled Speech and Retaliation – 42 U.S.C. 1983 – Individual Liability)**

75. Plaintiffs restate and incorporate here the allegations in paragraphs 1 through 73.

76. The First Amendment protects the right to be free from compelled speech and from being retaliated against for refusal to give false testimony.

77. In taking the actions described above, Defendants intentionally violated Plaintiffs' rights to be making compelled speech or being retaliated against for giving false testimony.

78. As supervisor of SIU, Defendant Prins inaction in the training, supervision, and control of his subordinates, Defendants Yancey, Gould, Plante, and Nofziger, acquiesced to the constitutional deprivations against the Plaintiffs.

79. The actions of Defendant Yancey, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs. As a result of said intentional conduct, Plaintiffs are entitled to punitive damages against Defendant Yancey, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

80. The unreasonable deprivation of Plaintiffs' rights was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, shock, anxiety, nervousness, and loss of ability to enjoy certain recreational and leisure activities. Plaintiffs are entitled to all of his damages in an amount to be ascertained according to proof at trial.

81.   Additionally, see below, Plaintiffs seek declaratory relief that such conduct was unconstitutional.

## DEMAND FOR JURY TRIAL

82.   For all claims alleged in this Complaint, Plaintiff demands a jury trial.

## DECLARATORY RELIEF
### (Official Capacity)

83.   Plaintiff is entitled to declaratory relief naming the following:

   a.   That Defendants' system of solitary confinement violates the due process clause;

   b.   That Defendants' system of solitary confinement is cruel and unusual punishment;

   c.   That Defendants' system of solitary confinement violates the equal protection clause;

   d.   That Defendants violated Plaintiffs' rights by coercing false testimony and fabricating evidence from them and others;

   e.   That Defendants violated Mr. Mora-Contreras's rights by transferring him to TRCI in retaliation; and

   f.   That Defendants violated Plaintiffs rights secured by the First Amendment.

## INJUNCTIVE RELIEF
### (Official Capacity)

84.   Plaintiff is entitled to injunctive relief requiring Defendants and their successors to:

   a.   Cease using solitary confinement for punishment;

   b.   Cease creating false evidence;

   c.   Cease coercing inmates into providing false testimony;

   d.   Reform its disciplinary review process to adequately provide due process of law;

   e.   Restrain Defendants from retaliating against Plaintiffs;

    f.      Cease the practice of retaliatory transfers;

    g.      Restrain their employees from unduly targeting Plaintiffs; and

    h.      Prevent the violation of Plaintiffs' constitutional rights, as outline above.

## REASONABLE ATTORNEY'S FEES AND COSTS

85. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

86. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## CONCLUSION

WHEREFORE, plaintiff prays for relief as follows:

a. For judgment in favor of Plaintiffs against Defendants for their damages;

b. For injunctive relief as to Claims 1, 2, and 3;

c. For declaratory relief as to all claims;

b. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

c. For such other and further relief as may appear just and appropriate.

DATED: October 2, 2018

                                        */s/ Juan C. Chavez*
                                        Juan C. Chavez, OSB #136428
                                        65 SW Yamhill St., #300
                                        Portland, OR 97204
                                        *LEAD ATTORNEY*

                                        */s/ Crystal S. Maloney*
                                        Crystal S. Maloney, OSB #164327

                                        Attorneys for Plaintiff